UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ERIKA POCHE RODRIGUE                              CIVIL ACTION

VERSUS                                            NUMBER: 13-1814

CAROLYN W. COLVIN,                                SECTION: "C"(5)
ACTING COMMISSIONER OF
SOCIAL SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying Plaintiff's application for Disability Insurance Benefits ("DIB").  (Rec. docs. 14, 21).

Erika Poche Rodrigue, Plaintiff herein, filed the subject application for DIB on September 16, 2010, with a protective filing date of September 9, 2010, alleging disability as of March 7, 2008.  (Tr. pp. 126-134)  In a "Disability Report-Adult" form that appears in the record, the conditions resulting in Plaintiff's inability to work were identified as depression, elevated antinuclear antibodies ("ANA"), hives, chronic diarrhea/colitis, joint pain primarily in the limbs, Wolf Parkinson's White ("WPW") syndrome, supraventricular

tachycardia ("SVT"), possible recurrence of WPW, and testing for lupus pending.  (Tr. pp. 142-151).    Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative process on February 8, 2011.  (Tr. pp. 74-77).  Pursuant to Plaintiff's request, a hearing *de novo* before an Administrative Law Judge ("ALJ") went forward on November 4, 2011 at which Plaintiff, who was accompanied by her husband and was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 78-79, 40-61).  On December 6, 2011, the ALJ issued a written decision in which she concluded that Plaintiff was not disabled within the meaning of the Social Security Act ("SSA").  (Tr. pp. 7-25).  The Appeals Council ("AC") subsequently denied Plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner.  (Tr. pp. 1-6).  It is from that unfavorable decision that the Plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In her cross-motion for summary judgment, Plaintiff frames the issues for judicial review as follows:

1. [a]n opinion by a non-examining physician cannot constitute "substantial evidence" when a non-examining physician makes specific medical conclusions that either contradict or are unsupported by findings made by an examining physician.

2. [t]he decision does not provide "good cause" for rejecting the opinions of the treating physicians.

3. [t]he decision does not address the findings of the consulting psychiatrist.

(Rec. doc. 14-2, p. 1).

Relevant to the issues to be decided by the Court are the following findings that were made by the ALJ:

1. [t]he claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. [t]he claimant has not engaged in substantial gainful activity since March 7, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. [t]he claimant has the following severe impairments:  arthralgias, colitis, anxiety, depression, urticaria (hives) and reflex sympathetic dystrophy (20 CFR 404.1520(c)).  *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985).

4. [t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she would be limited to occasional overhead reaching bilaterally, and occasional pushing and pulling bilaterally with the upper extremities.  She would require work in an environment free of fast-paced production requirements with routine workplace changes.  She would need access to a restroom during the workday.

6. [t]he claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. [t]he claimant was born on January 9, 1979 and was 29 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8. [t]he claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. [t]he claimant has acquired work skills from past relevant work (20 CFR 404.1568).

10. [c]onsidering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a) and 404.1568(d)).

11. [t]he claimant has not been under a disability, as defined in the Social Security Act, from March 7, 2008, through the date of this decision (20 CFR 404.1520(g)).

(Tr. pp. 12, 13, 20, 21).

Judicial review of the Commissioner's decision to deny DIB is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues *de novo*, nor may it substitute its judgment for that of the Commissioner.  *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts.  *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that she is disabled within the meaning of the Social Security Act.  *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).  Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled.   *Harrell*, 862 F.2d at 475.   In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 CFR §404.1520, as follows:

1.   an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2.   an individual who does not have a "severe impairment" will not be found to be disabled.

3.   an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4.   if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

5.   if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S.Ct.

2287, 2294 n.5 (1987).  If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. *Fraga*, 810 F.2d at 1304 (citing *Lawler v. Heckler*, 761 F.2d 195, 198 (5th Cir. 1985)).  Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Fraga*, 810 F.2d at 1302.

The documentary evidence that was generated during the relevant time period[1] begins with a Holter monitor test report dated March 14, 2008 from the Cardiovascular Institute of the South ("CIS") which was ordered following reports of palpitations.  That testing revealed a normal sinus rhythm, a maximum heart rate of 150 beats per minute ("bpm"), a minimum heart rate of 70 bpm, and no evidence of tachyarrhythmia being noted.  (Tr. p. 445).  Plaintiff was seen at the Thibodaux's Women's Center ("TWC") on July 24, 2008 after having recently undergone a caesarean section.  Her blood pressure was measured at 124/72 July 24, 2008 at that time.  (Tr. p. 276).  Further follow-up visits at TWC went forward on July 31, 2008 and August 14, 2008 and Plaintiff's blood pressure remained stable.  (Tr. p. 271).

On October 21, 2008, Plaintiff was seen by Dr. Charles Monier of the Digestive Health Center ("DHC") for complaints of a fever, abdominal pain, rectal bleeding, and a

---

[1] Under 20 C.F.R. §404.1512(d), the Commissioner is required to develop the medical history of a DIB claimant for at least twelve months prior to the month in which the application for benefits was filed unless there is reason to believe that development of an earlier time period is necessary.  As Plaintiff filed her application for DIB in September of 2010 but alleged a disability onset date of March 7, 2008, the relevant time period begins with that earlier date.

discharge of mucus.  (Tr. pp. 324-325).  Abdominal x-rays were taken the following day which revealed a non-specific bowel gas pattern without evidence of obstruction and no abnormal calcifications.  (Tr. pp. 321-323).  Subsequent stool cultures were negative.  (Tr. pp. 319-320).  A colonoscopy was performed on November 11, 2008 which demonstrated grade 1 internal hemorrhoids.  The pathology report that was generated as a result of that procedure was unremarkable.  (Tr. pp. 192-193, 317-318).  Plaintiff returned to Dr. Monier for follow-up care on December 2, 2008 but his treatment note from that date is not particularly readable.  (Tr. p. 314).  The note documenting Plaintiff's next visit with Dr. Monier on February 9, 2009 was similarly unreadable but the diagnosis appears to be diarrhea and irritable bowel syndrome ("IBS").  (Tr. pp. 312-313).  The following day, Plaintiff returned to TWC for an annual physical.  (Tr. p. 275).

On February 25, 2009, plaintiff underwent an upper endoscopy ("EGD") which revealed a normal esophagus and duodenum and a small hiatal hernia.  (Tr. pp. 190-191, 310-311).  Plaintiff was next seen by Dr. Mohan Gandhi of the Allergy & Asthma Clinic on two separate occasions in March of 2009.   In a letter dated March 11, 2009 that was addressed to Plaintiff's treating dermatologist, Dr. Gandhi recalled that Plaintiff had a history of intermittent symptoms of urticaria for the previous six years which had become more prominent since the birth of her child six months earlier.  Plaintiff also had a history of chronic diarrhea and spondylitis but no other joint pain.   Non-specific colitis had reportedly been revealed through a colonoscopy.   Medications at the time included Librium, Xyzal, and Allegra.  Upon physical examination, Plaintiff had mild nasal congestion and a few hives on her face but the findings were otherwise normal.  Laboratory data

indicated that Plaintiff's ANA titers were extremely high, greater than 1:120 in a speckled pattern, and her chronic urticaria index was normal at 8.2.  The diagnosis was chronic urticaria, irritable bowel disorder, and spondylosis.  Dr. Gandhi recommended that Plaintiff continue with Xyzal and Allegra as she seemed to be doing well on it, that she see a rheumatologist for her positive ANA, and that an endocrinologist be consulted for highly elevated T3.  Plaintiff's chronic urticaria was thought to be of an autoimmune nature.  (Tr. pp. 198-206).

Plaintiff was next seen at the Family Doctor Clinic ("FDC") on March 14, 2009 for complaints of a fever and sinus issues.  (Tr. p. 339).  On April 6, 2009, Plaintiff was evaluated by Dr. Angele Bourg, a rheumatologist, who summarized her findings in a lengthy letter of that same date to Dr. Gandhi.  There, Plaintiff was described as a thirty-year old individual with a six-year history of urticaria which had developed after a viral infection with an allergy to peanuts being the possible cause.  Plaintiff had done well with daily doses of Zyrtec or Allegra until eight months earlier when she developed severe diarrhea.  The testing that had been ordered by Dr. Monier was recounted as was a diagnosis of unspecified colitis and initial treatment with Flagyl and Prednisone.  Plaintiff was then placed on Librax which improved her diarrhea which now occurred once per week with occasional blood.  Plaintiff reported that in February of 2009, she experienced a severe case of urticaria which required an emergency room visit where she was treated with steroids, epinephrine, and Benadryl.  Her medications were subsequently changed to Allegra and Xyzal but she continued to have urticaria on a daily basis involving her hands and her feet to a lesser extent.  Tylenol or Ibuprofen were taken for occasional neck and back pain.

8

Sleep was characterized as "fair" and Plaintiff engaged in no regular exercise. Plaintiff reported a fifty pound weight loss over the previous eight months which she attributed to chronic diarrhea. Alopecia was denied as were recent fevers, chills, or infection. Dysuria and hematuria were likewise denied. Plaintiff also reported chronic neck, back, and shoulder pain as a result of two auto accidents some ten years earlier. Her hands were occasionally achy in the morning with some swelling and she additionally complained of chronic headaches. Plaintiff's stress level was high as a result of being a new mother and she experienced temperature instability and was hot all the time.

Upon physical examination, Plaintiff's weight was recorded as 185 pounds and her blood pressure was 116/80. Systemic evaluations of the HEENT, respiratory, cardiovascular, and abdominal systems were within normal limits. A musculoskeletal exam revealed slightly decreased range of motion in the cervical and lumbar spine but a Schober's test was negative, there was no joint synovitis, and strength was excellent throughout. The assessment was urticaria, chronic diarrhea that had been diagnosed with undifferentiated colitis in 2008, a reported fifty-pound weight loss over the previous eight months, arthralgias involving the neck and lower back, and positive ANA. Further autoimmune testing was to be conducted and x-rays of the lumbar spine and iliac joints were to be obtained. Dr. Bourg's evaluation report also includes a handwritten notation that all laboratory testing was negative except for elevated ESR and CRP levels, that Plaintiff was to be referred to a dermatologist for a skin biopsy, that the positive ANA reading was not considered to be clinically significant, and rule out evidence of SLE/RA. (Tr. pp. 207-209).

Plaintiff returned to Dr. Monier on July 22, 2009 for treatment of constipation.  Her weight was recorded as 184 pounds at the time.  Miralax was prescribed.  (Tr. p. 309).  She was next seen by Dr. Cowen on September 23, 2009 for right foot pain pursuant to a referral from Dr. Higgins.  Plaintiff reported significant  pain to the right medial foot two weeks earlier that was unaccompanied by trauma and was prohibitive of weight bearing.  The "review of systems" portions of the doctor's note was positive for shortness of breath, occasional heart palpitations, difficulty in ambulating, headaches, depression, sleep difficulties secondary to pain, leg symptoms, and occasional restless leg syndrome on the right.  Negative findings were recorded for a host of other symptoms including chest pain, rashes/sores, weight gain/loss, bleeding (including bowel movements), back or neck pain, muscle weakness, numbness/tingling, joint pain or stiffness, or any other pain or symptoms.  Plaintiff was using a right walking boot and crutches at the time and mild whitish discoloration, decreased sensation, pain, and swelling was noted on the right although motor strength was 5/5 throughout the lower extremities and there were no sensory deficits.  The impression was right foot pain of unknown etiology with a suggestion of possible, although not overt, sympathetic mediated pain.  Recommendations included a triple phase bone scan, a cource of Medrol Dosepak, Lyrica samples, physical therapy, and a follow-up visit in a few weeks.  (Tr. pp. 331-332).

Plaintiff underwent the recommended triple phase bone scan on September 28, 2009 at the Thibodaux Regional Medical Center ("TRMC").  That testing revealed minimally increased accumulation of radionuclide of the left metatarsophalangeal joint of the left hind foot which was of uncertain etiology or significance.  (Tr. pp. 337-338).  Plaintiff returned

to Dr. Cowen the following day and reported 90% relief after apparently receiving steroid injections.  She was continued on Lyrica, was to begin physical therapy, and was to return in three weeks.  (Tr. p. 330).  That follow-up visit went forward on October 20, 2009 at which continued progress was reported although Plaintiff did have persistent pain, particularly in the evenings after being on her feet all day.  Nevertheless, there was no swelling or warmth at the ankle or foot and a full range of motion throughout but some deep tenderness and soreness into the anterior ankle joint itself was reported.  The dosage of Plaintiff's Lyrica was to be increased and she was to be transitioned from physical therapy to a home exercise program.  Plaintiff was also desirous of seeking a second opinion from a rheumatologist.  (Tr. p. 329).

On December 8, 2009, Plaintiff was seen by Dr. Tamika Webb-Detiege of the Ochsner Foundation Hospital for evaluation of her positive ANA status.  In summarizing the history of Plaintiff's illness, the doctor recalled that Plaintiff had undergone a colonoscopy which revealed non-specific colitis and was treated with Librax.  Concerns were also voiced about the possibility of lupus accompanied by a recent malar rash, photosensitivity for several years, and oral ulcers for many years.  Plaintiff had been diagnosed with unspecified urticaria in approximately February of 2008 for which she took Methotrexate that was very helpful.  She reported pain to her hands as well as persistent pain to the right first toe.  Pain was rated as a "4" on a scale of "1" to "10," fatigue was rated as an "8," and her global assessment was rated as an "8."  Plaintiff had no chest pain or shortness of breath but she did suffer from intermittent diarrhea that was controlled with Librax.

Upon physical examination, Plaintiff stood at 5' 5.5" tall and weighed 184.3 pounds, reporting a weight loss of seventy pounds since her illness developed.  There was a full range of motion with no evidence of abnormalities and the upper extremities were normal as well.  Examination of the lower extremities demonstrated only tenderness at the left first joint MTP site of Plaintiff's RSD.  Chest x-rays were negative and an arthritis joint survey revealed only minimal degenerative changes in the hands and feet with no evidence of inflammatory arthritis.  No rashes, lesions, or ulcers were noted.  The impressions were:  1) positive ANA, 2) arthralgias involving the hands with swelling per Plaintiff's report, 3) fatigue, 4) non-specific urticarial rash being treated with Methotrexate, and 5) non-specific colitis.   Dr. Webb-Detiege described Plaintiff as a "complex patient" without obvious evidence of lupus but with positive ANA and a history of oral ulcers.  Various testing was to be conducted and it was possible that Plaintiff's positive ANA status was secondary to her history of colitis but the hope was to rule out any other rheumatologic disorder.  (Tr. pp. 219-222, 224-225).

Plaintiff returned to Dr. Webb-Detiege for a follow-up visit on December 9, 2009 with the chief complaints being identified as positive ANA, RA, hand pain, hives, and fatigue.  She reported a recent all-day occurrence of diarrhea which had resolved within one day as well as hives to the bottom of the feet and joint pain which had resolved in two days.  Plaintiff's fingers had been swollen since then with achiness in her hand and there was one hour of stiffness in the morning.  Pain was now 6.5/10, fatigue was 7.5/10, and Plaintiff rated her global assessment as 6.5/10.  A systems review was positive for diarrhea, hives on the bottom of her feet, joint pain, depression, and feelings of being overwhelmed

by her chronic medical issues and parental demands.  Plaintiff's weight was unchanged.
Upon physical examination, Plaintiff ambulated with a slow gait and was noted to be
wearing a brace on her right foot.  There was mild tenderness on palpation of the left
second finger diffusely, not limited to the joints.  There was a full range of motion of the
shoulders, elbows, and wrists but with some discomfort to the left shoulder.  X-rays
revealed minimal degenerative changes in the hands and feet but no erosive changes were
noted.   No rashes were present.  The impressions were:  1) positive ANA, 2) arthralgias, 3)
a history of non-specific urticarial rash, and 4) a history of non-specific colitis.   The
treatment plan included a joint scan to search for any evidence of inflammation in the
joints and gynecological follow-up to rule out the possibility of endometriosis.  (Tr. pp. 216-
218).

On January 7, 2010, Plaintiff was seen again at TWC for complaints of bleeding on
sexual relations and depression.  (Tr. p. 272).  Pursuant to Dr. Webb-Detiege's request, a
whole body bone/joint scan was performed on January 11, 2010 which produced negative
results with no evidence of synovitis.  (Tr. p. 223).  Plaintiff was next seen by Dr. Cowen on
January 26, 2010 and reported that her neuropathic/RSD/CRPS pain was controlled with
Lyrica.  Bilateral knee and wrist pain were complained of.  Refills for Lyrica and Ultracet
were issued.  (Tr. p. 328).  Plaintiff was seen again by Dr. Webb-Detiege on February 2,
2010 and the chief complaints were identified as positive ANA, joint pain, hives, diarrhea,
and fatigue.  Since her last visit to the doctor, Plaintiff had experienced a flare up of
symptoms including hives, diarrhea, and joint pain.  The dosage of Plaintiff's Methotrexate
had been doubled and her pain management doctor was to wean her off of Lyrica and was

to add Ultracet.  Sleep troubles secondary to discomfort were noted.  Plaintiff reported her pain as a "3" to a "4," described as a mild, aching sensation mainly involving the hands.  Daily headaches for the previous two months were also noted but Plaintiff had not yet discussed those occurrences with her primary care physician ("PCP").  Fatigue was rated as an "8" and the global assessment was a "6."  Plaintiff's weight was recorded as 183.3 pounds.  She ambulated with a normal gait and station, had a full range of motion of the shoulders, elbows, and wrists, and only mild discomfort on palpation of the third metacarpophalangeal joint of the right hand.  There was no evidence of rashes, lesions, or ulcers on the head or neck and no oral or nasal ulcers were identified.  The impressions were:  1) positive ANA, 2) arthralgias involving the hands, 3) non-specific urticarial rash being treated with Methotrexate, and 4) non-specific colitis.  Plaintiff was to continue with Methotrexate and was to consult with her PCP for her headaches and with her gynecologist on those issues.  (Tr. pp. 213-215, 297).

Plaintiff was next seen at TWC for pre-operative clearance on February 9, 2010 and her weight was recorded at 183 pounds.  (Tr. p. 274).  An EKG that was performed on that same date was normal.  (Tr. pp. 509-511).  On February 18, 2010, Plaintiff underwent a hysteroscopy, diagnostic laparoscopy, and vaporization of endometriosis with curettage at the hands of Dr. Philip Neal at TRMC.  (Tr. pp. 503-508, 512).  Plaintiff presented to the TRMC Emergency Room ("ER") on February 20, 2010 for complaints of urinary retention.  She was ultimately discharged in improved condition with prescription for Cipro and Pyridium.  (Tr. pp. 493-501).  Post-operative care was administered at TWC on February 25, 2010.  (Tr. p. 274).  Plaintiff was still bleeding at the time of a follow-up visit to TWC on

March 9, 2010 but no other adverse findings were noted.  (Tr. p. 273).  By March 15, 2010, Plaintiff was still suffering from pelvic pain and bleeding with sexual relations.  Various medications were prescribed and a further treatment plan was formulated.  (Tr. p. 277).

On March 23, 2010, Plaintiff went through pre-operative screening at CIS in the form of an EKG which was normal.  (Tr. p. 441).  Two days later, Plaintiff underwent a laparoscopically assisted vaginal hysterectomy ("LAVH") with bilateral salpingo-oophorectomy ("BSO") by Dr. Neal at TRMC.  (Tr. pp. 479-486).  Post-operative care was administered and Plaintiff's staples were removed at TWC on March 30, 2010.  (Tr. p. 279).  On April 6, 2010, a small amount of bleeding remained.  (Tr. p. 282).  Further follow-up care was administered at TWC on April 22, 2010.  (*Id.*).  Some bleeding remained when Plaintiff returned to TWC on May 18, 2010 and the note from a subsequent clinic visit on May 25, 2010 bears the notation "granulation tissue."  (Tr. p. 280).  Bloodwork was done on June 14, 2010.  (Tr. p. 231).

On June 16, 2010, Plaintiff was seen again by Dr. Cowen.  Even though the bloodwork that had been ordered by her rheumatologist at Ochsner had been unremarkable, she expressed a desire to switch to a different practitioner as the personnel at Ochsner would not allow her to get her bloodwork done locally or to get the results thereof over the phone.  Due to cost concerns, Neurontin was substituted for Lyrica which was not as effective but was still helpful.  At the time of this office visit Plaintiff had good motor strength in both lower extremities although she reported some tingling sensations in the right dorsal lateral foot which was off-and-on in nature.  Plaintiff was to continue on

Neurontin as well Ultracet and was to return in six months or earlier if needed.  (Tr. p. 327).

On July 12, 2010, Plaintiff was evaluated by Dr. Lee Grafton of the Grafton Dermatology & Cosmetic Clinic with the chief complaint being identified as a need to check her liver functions.  In terms of symptoms, Plaintiff complained of arthralgias and pain all over.  Lyrica had been discontinued, Plaintiff had been started on Gabapentin as well as Ultracet, and she was scheduled to return to Dr. Cowen on August 2nd.  Although the remainder of the treatment note from that date is difficult to decipher, it appears that even though Plaintiff continued to complain of a rash on her legs, her legs were clear that day.  A treatment plan was put into place.  (Tr. p. 230).  Plaintiff returned to Dr. Grafton on August 23, 2010 for a check of her urticaria which was characterized as generalized.  Plaintiff indicated that she was still breaking out and was suffering from fatigue and hair loss.  She expressed a desire to wean off of Methotrexate and to start on Plaquenil as Dr. McCain suspected that she may have lupus.  The presence of oral ulcers was also noted as was sensitivity to the neck and eyes.  The assessment was systemic lupus erythematosus ("SLE").  The dosage of Methotrexate was to be decreased and Plaintiff was started on Plaquenil.  (Tr. pp. 228-229).  Further labwork was done on August 26, 2010.  (Tr. pp. 237-240, 534-538).

On September 26, 2010, Plaintiff completed the Administration's form denominated "Function Report-Adult" that was designed to elicit information on how her conditions limited her activities.  There, Plaintiff identified the symptoms limiting her ability to work as bouts of chronic diarrhea; joint pain, especially in the hands and legs; chronic fatigue; an

inability to sleep when in more severe pain; ". . . nausea, etc."  For Plaintiff, an average day consisted or rising and making breakfast for her daughter and herself, taking medications, battling fatigue, eating lunch, taking a nap, cooking dinner, taking more medications, and retiring for the evening.  Plaintiff tended to her daughter with occasional assistance from her family and she cared for the family pet but her husband reportedly did everything else. Due to pain, Plaintiff slept in increments of a few hours.   She was able to prepare sandwiches and easy meals and to wash dishes but the majority of the household chores were performed by her husband due to joint pain, chronic fatigue, stomach problems, and depression.   Plaintiff could both drive and ride in a car, go out alone, and go grocery shopping with assistance in lifting.   Financial matters were handled by her husband. Interests were largely limited to reading and Plaintiff was no longer able to fish, paint, or enjoy outside activities as she once did.  She was able to visit with family members and to occasionally watch her brother play football.  As a result of her conditions and resulting pain, Plaintiff was limited in lifting, squatting, walking, stair climbing, and using her hands. Depending on how she felt on any given day, Plaintiff could walk thirty minutes or less before needing to rest.  She could follow instructions well and get along with authority figures very well but stress and changes in routine were difficult lately.  (Tr. pp. 152-161).

Plaintiff returned to Dr. Cowen on October 12, 2010, expressing some difficulties with Neurontin and a desire to go back on Lyrica.  A follow-up visit with Dr. McCain was supposedly to go forward that day and there was some question about her diagnosis. Plaintiff complained of diffuse joint aches, more in the lower extremities than the upper ones, and she reported that her ANA was over 1200.  Dr. Cowen deferred to Plaintiff's

rheumatologist regarding treatment for that condition and a new rheumatologist in the Thibodaux area was mentioned as a possible healthcare provider.  Plaintiff was given a prescription for Lyrica and was to be weaned off Neurontin.  (Tr. p. 326).

On October 15, 2010, Plaintiff was seen by Dr. Bart Denys of CIS following complaints of an irregular heartbeat and shortness of breath.  In conjunction with that evaluation, Plaintiff's ANA positive status and a history of WPW with status-post cardiac ablation in 2006 were noted.  Among the testing that was ordered was a Holter monitor and an echocardiogram ("ECG").  The results of the ECG came back as normal.  The former testing demonstrated a sinus rhythm with a mean heart rate of 83 beats per minute, one brief episode of SVT/physiologic tachycardia with a heart rate of 152 beats per minute, and no pauses.  (Tr. pp. 358-440).

Plaintiff returned to CIS to obtain the recent test results on November 1, 2010.  The assessment was a history of WPW, status-post ablation in 2006, and SVT/PAT.  Given the largely unremarkable test results, Plaintiff was directed to return at age forty unless there was a problem and to follow-up with Dr. Magee.  (Tr. pp. 345-347).  Plaintiff was next seen at FDC on November 2, 2010 for a checkup and to obtain a flu shot.  The assessment was positive ANA and elevated liver function studies.  (Tr. p. 339).

On December 16, 2010, Plaintiff was seen for the first time by Dr. Luis Espinoza of the TRMC Rheumatology Practice for the purpose of obtaining a second opinion on what was described as an "unspecific autoimmune disease."  Medications at the time included Lyrica, Cymbalta, Ultracet, and Plaquenil.  Plaintiff recalled that at some point in the past year she had begun complaining of severe pain overall, mainly in the hands and legs,

fatigue, sleeping difficulties, diminished energy, and fibromyalgia symptoms.  She denied shortness of breath, chest pain, and joint swelling but did describe hair loss, an occasional facial rash, and mouth ulcers.  On physical examination, there were definitive fibromyalgia tender joints, >12/18, but the results were otherwise normal.  The assessment was unlikely lupus but definite fibromyalgia.   Further bloodwork was to be done, the dosages of Cymbalta and Tramadol were increased, Lyrica was continued, and Plaintiff was encouraged to exercise.  (Tr. p. 527).

On December 18, 2010, Plaintiff underwent a consultative evaluation by Dr. Jose Simon, an internist affiliated with Point of Care Health Solutions in Galliano, Louisiana.  In the "Major Problem List," Plaintiff's medical issues were identified as:  1) WPW syndrome, status-post ablation in 2006 and "doing great" despite occasional SVT episodes; and, 2) possible collagen disease in light of studies for suspected lupus, high ANA levels, malar rash with some sensitivity on the arms and legs after sun exposure, oral ulcers, muscle and joint pain, occasional swelling to the fingers, and occasional diarrhea.  Dr. Simon noted that Plaintiff could perform household activities, dress and feed herself independently, drive, and visit with family.  It was estimated that Plaintiff could lift ten pounds, sit or stand for twenty minutes, and walk for half a block.  Upon physical examination, Plaintiff had a normal gait and station and normal hand and arm function with the ability to grip, pinch, grasp, handle, and finger being normal bilaterally.  Range of motion was intact in all joints and muscle strength was 5/5 bilaterally.  Dr. Simon believed that Plaintiff would be able to push, pull, reach, crouch, squat, and stoop with some limitations depending on joint pain involvement.   In summarizing his findings, Dr. Simon opined that Plaintiff's WPW

syndrome had been asymptomatic for some time and that she suffered from lupus.  He also found that although Plaintiff had no rash at the time, that she had a history of such occurrences as well as a history of joint pain, episodes of diarrhea, and a history of lupus in her family.  (Tr. pp. 246-252).  Plaintiff returned to TWC on January 19, 2011 and complained of pain and bleeding.  Evamist was prescribed.  (Tr. p. 283).

On February 4, 2011, Plaintiff underwent a consultative psychiatric evaluation by Dr. Donna Mancuso.  Plaintiff complained of undergoing two surgeries for a heart condition so she could then get pregnant, of having to resign from work due to a doctor-recommended reduction in hours, and of suffering post-delivery from bleeding stools, diarrhea, and ninety pounds of weight loss.  Other post-delivery symptoms and occurrences included a butterfly rash, transient hives, multiple tests, an elevated ANA level, pain in the limbs, vaginal bleeding, a hysterectomy, a possible diagnosis of lupus, and depression.  Symptoms at the time of the evaluation were poor sleep, decreased appetite, depressed mood, high anxiety, a low energy level, increased spousal conflict, and a lack of interest in normal pleasurable activities.  Plaintiff had no auditory or visual hallucinations, no delusions, no history of manic episodes, and no history of substance abuse.

Upon mental status examination, there were no thought disorders, affect was appropriate and calm, and mood was described as "kind of nervous."  There were no suicidal or homicidal ideations, memory was within normal limits, and abstract thinking and judgment were good.  Dr. Mancuso's diagnosis was as follows:  Axis I – depression, not otherwise specified, rule out major depressive disorder secondary to autoimmune and/or pain disorder, anxiety disorder, not otherwise specified, rule out secondary causes, and

rule out pain disorder with psychological and physical features; Axis II – deferred; Axis III –
chronic pain, unspecified autoimmune disorder (lupus per record), history of WPW,
hysterectomy, cardiac ablation, arrhythmia by history, tonsillectomy, and wisdom teeth
removal; Axis IV – poor health, pain, job loss, marital strife, and childbearing; and, Axis V –
a GAF score of 61.   The doctor noted that Plaintiff did not demonstrate significant
disturbance of memory or concentration, had a good ability to relate to others, and had a
fair to good ability to maintain attention and to perform simple repetitive tasks for two
hour blocks of time.   Plaintiff's ability to sustain effort and to persist at a normal pace over
the course of a routine forty-hour work week were thought to be fair from a psychiatric
standpoint but may be impacted by physical complaints which were deferred to another
evaluator.   The ability to understand, remember, and follow simple commands was good
but the ability to tolerate the stress/pressure associated with day-to-day work activities
and demands would likely be impaired.   Dr. Mancuso believed that Plaintiff would benefit
from receiving psychiatric evaluation and treatment, including psychotherapy, and her
psychotropic medication regime was thought to need reevaluation to include attention to
fatigue.  (Tr. pp. 284-293).

On February 22, 2011, Dr. Espinoza authorized refills for Plaintiff's Cymbalta,
Tramadol, and Allegra.  (Tr. p. 525).  Plaintiff was seen again by Dr. Espinoza on March 3,
2011 who described her as "still very symptomatic" at that time with pain in the hands and
knees, sleep difficulties, fatigue, and low energy but still no systemic symptoms.   On
physical examination, Plaintiff had only mildly tender fibromyalgia points at 11/18 and no
synovitis, skin rash, or edema.  The assessment was fibromyalgia.  The dosage of Cymbalta

was increased, Ultracet was continued, and Plaintiff was directed to exercise and to return in three months. (Tr. p. 522). Notwithstanding the latter advice, Plaintiff returned to Dr. Espinoza on March 17, 2011 still suffering from pain, especially in the hands, fingers, and knees. Sleep was difficult secondary to pain and she occasionally had a mylar rash that came and went. On physical examination, Plaintiff had a mild facial butterfly rash but she had full grip strength in both hands, the knees were normal in appearance, and there were no other skin rashes or edema. The assessment was fibromyalgia, described as "doing well," positive ANA, and arthralgias. Naproxen was added to Plaintiff's medication regimen and she was to be seen again in three months. (Tr. p. 520).

Plaintiff returned to Dr. Espinoza on April 21, 2011 complaining of bruising to her body which had appeared without trauma and may have been increasing. The impression was ecchymosis and Plaintiff's medications were adjusted. (Tr. p. 518). Plaquenil was added to the list of Plaintiff's medications on May 3, 2011. (Tr. p. 516). The final set of medical records that was admitted in the administrative proceedings below were all generated on May 5, 2011. The first of those documents Plaintiff's return visit to Dr. Webb-Detiege with the chief complaints being identified as positive ANA, joint pain, hives, diarrhea, and fatigue. Plaintiff reported pain to the elbow, hands, wrists, knees, fingers, feet, and shoulders which was rated as "5" to "6" on the day of the evaluation but was known to go up to "8." Pain was increased following physical examination by doctors and there had been one episode of urinary incontinence. Upon physical examination, Plaintiff ambulated with a normal gait and station, had a full range of motion of the shoulders, elbows and wrists, had no pain to palpation of the metatarsophalangeal joints, no pain to

palpation of the joints of the upper or lower extremities, and no synovitis.  There was also no evidence of rashes, lesions, or ulcers on the head or neck and no oral or nasal ulcers. The impressions were:  1) positive ANA, 2) athralgias involving the hands, 3) non-specific urticarial rash being treated with Methotrexate, 4) non-specific colitis, and 5) fatigue. Further testing was to be done and Plaintiff was re-started on Plaquenil.  (Tr. pp. 298-305).

On that same day, two of Plaintiff's treating physicians, Drs. Grafton and Espinoza, completed "To Whom It May Concern" checklist forms that had been supplied to them by Plaintiff's attorney.  Those forms contained a series of questions susceptible of "yes" or "no" answers that asked whether various complaints were consistent with the doctors' knowledge and understanding of Plaintiff's condition.  With the exception of the question directed to whether Plaintiff experienced swelling on sustained or repetitive use of her hands, Dr. Grafton provided affirmative answers to all of the questions to indicate that Plaintiff suffered from pain in the legs bilaterally "most of the time" and that she experienced exacerbation of pain in her legs on protracted sitting and was thus required to move about or recline for relief.  (Tr. p. 306).  In the "[r]emarks" portion of the form, Dr. Grafton stated that Plaintiff ". . . ha[d] an autoimmune disorder not classified.  Probably Lupus (SLE)."  (*Id.*).  For his part, Dr. Espinoza failed to answer two of the eleven questions, including subparts, that were set forth on the form that he completed but provided affirmative answers to the remaining nine questions, including those asking whether Plaintiff suffered from pain in the legs bilaterally and pain throughout the upper extremities to the hands "[m]ost of the time . . ."  (Tr. p. 307).  The two questions that were

left unanswered asked whether Plaintiff experienced swelling and progressive weakness on sustained or repetitive use of her hands.  (*Id.*).

As noted earlier, a hearing *de novo* before an ALJ went forward on November 4, 2011.  Plaintiff's husband was in attendance at the hearing but provided no testimony and an opening statement was waived by Plaintiff's attorney.  Plaintiff was thirty-two years of age at the time, possessed a BA degree, and had last worked on March 7, 2008 as a director of business development at a doctor's office.  Plaintiff testified that she left that job after her doctor advised her to work fewer hours when she was pregnant and started having complications with her heart in the form of WPW syndrome.  When asked why she was unable to work full-time, Plaintiff cited joint pain, chronic fatigue, depression, and elevated ANA.  A diagnosis of lupus was suspected and was pending and Plaintiff had also been diagnosed with fibromyalgia.   Symptoms included joint pain, fatigue, and diarrhea which was once as much as three to four times per week and lasted all day.  Since then, Plaintiff had begun taking Librax and the frequency diminished to one to two episodes per week.  In addition to medication, Plaintiff had tried physical therapy for her joint pain but it only aggravated her condition.   Plaintiff had consulted with her rheumatologist within the previous two weeks who recommended that she see a counselor to address depression caused by marital discord.  Cymbalta was only partially effective in addressing her depression.  Plaintiff spent her time caring for her three year old daughter with occasional assistance from family members.

Continuing, Plaintiff recalled her treatment with Drs. Espinoza and Grafton but could not remember precisely when those visits occurred in relation to the "To Whom It

May Concern" letters that the doctors executed on May 5, 2011.  Since that time, Plaintiff had treated primarily with Dr. Webb-Detiege, with the most recent visit being two weeks earlier, and a neurologist, Dr. Edward Haight.  On an average day, Plaintiff would rise, eat breakfast and feed her daughter, eat lunch, nap until 3:00/3:30, and retire around 8:00 p.m. Plaintiff testified that she was in pain all day and night.  She was able to drive her daughter to school and frequently stopped at her mother's house, which was located nearby, to rest. Medications at the time included Cymbalta, Ultracet, Lyrica, and Plaquenil, the latter of which sometimes made her nauseous.  She also took Topamax for migraines which had occurred three or four times per week but lasted longer than a day when they occurred. However, it had been a week since Plaintiff had experienced her last migraine.  In terms of other conditions which limited her from working, Plaintiff identified joint pain in the hands, swelling, a butterfly rash on her face, and rashes all over her arms, legs, feet, and hands. The rashes first manifested themselves in 2009.  Plaintiff experienced sharp pain to her fingers, hands, wrists, elbows, and arms when lifting a gallon of milk and was reportedly unable to lift her daughter.  Standing without pain could only be accomplished for sixty seconds and sitting was limited to ten minutes.  (Tr. pp. 42-52).

Upon being tendered to her attorney for further questioning, Plaintiff testified that she had stubbed her toe and that because of her elevated ANA levels, she had developed reflex sympathetic dystrophy in her foot which required months of physical therapy to re-learn how to walk and during which she used crutches and a walking boot.  That problem had largely resolved although pain remained.  Occasionally Plaintiff would experience heart palpitations a few times per week due to WPW syndrome.  Plaintiff was unable to extend

her hands over her head without experiencing sharp pain in her arms.  Reaching to push and pull also elicited pain in the arms and hands.  Manipulation resulted in pain to the fingers and Plaintiff could only lift a cup of coffee without experiencing pain.  Grasping was also problematic.  Thus far in the hearing Plaintiff had requested permission to alternate positions as she was reportedly not used to sitting uninterrupted for such periods of time.  (Tr. pp. 52-54).

Katrina Verdun, a VE, was the next witness to take the stand.   After her qualifications were stipulated to Verdun began by classifying Plaintiff's most recent job as a business developer as light, skilled work with an SVP of 7.  Plaintiff had also worked as a community relations marketer which involved sedentary, skilled work carrying an SVP of 7.  Prior to that, Plaintiff had functioned as a grant coordinator which was classified as a sedentary, skilled job with an SVP of 7.  The ALJ then posed a hypothetical question to the VE which assumed an individual of Plaintiff's age, education, and work experience who had a residual functional capacity ("RFC") for light work with a need to alternate positions every hour for a few minutes; who would need to avoid climbing ladders, ropes, and scaffolds; who could occasionally climb ramps and stairs and could occasionally balance; and, who would need to avoid temperature extremes, excessive vibration, moving machinery, and work at unprotected heights.  With those limitations in mind, the VE testified that the individual described in the hypothetical question could perform all of Plaintiff's past work.  If the exertional demands of the hypothetical question were reduced to sedentary-level work, Verdun testified that the described individual could still perform Plaintiff's past work as a marketer or grant coordinator.

26

To the hypothetical question as originally framed, the ALJ added only occasional overhead reaching bilaterally, only occasional pushing and pulling with the upper extremities, and the need to work in an environment free from fast-paced production requirements with only routine workplace changes.  With those added limitations in mind, Verdun testified that the described individual would be unable to perform Plaintiff's past work.   However, the individual described in the second hypothetical question could perform the sedentary-level positions of surveillance system monitor, information clerk, or receptionist, significant number of which existed in the local and national economies.  Those jobs could still be performed if the person required access to a restroom during the day.  The same was true if the individual was limited to only occasional handling ("gross manipulation") bilaterally.   If, however, due to a combination of conditions the person would be unable to maintain work eight hours per day, five days per week, the identified jobs could not be performed.  (Tr. pp. 54-58).

Upon being tendered to Plaintiff's counsel for additional questioning, Verdun was asked whether the jobs that she had identified could still be performed if grasping and fingering ("fine manipulation") were limited to occasional.   In answer thereto, the VE testified that those added limitations would eliminate the receptionist position but not the information clerk or surveillance system monitor positions and, if the hypothetical person had to remove herself from her work station more than the time customarily allotted for lunch, morning, and afternoon breaks, that person would be subject to termination. Excessive absenteeism, defined as missing two or more days per month on a frequent basis, would also preclude employment.   At the conclusion of the hearing, the ALJ allowed the

record to be kept open for fourteen days for the submission of additional records from Dr. Espinoza and the Southeast Neuroscience Center.  (Tr. pp. 58-61).  As far as the record reflects, no such updated medical records were forthcoming from Plaintiff.

Plaintiff challenges the ALJ's decision to deny her DIB on three grounds.  First, Plaintiff alleges in rather generic terms that "[a]n opinion by a non-examining physician cannot constitute 'substantial evidence' when a non-examining physician makes specific medical conclusions that either contradict or are unsupported by findings made by an examining physician."  (Rec. doc. 14-2, pp. 1, 3).  Only upon reading the argument portion of her supporting memorandum does the basis of Plaintiff's first challenge become apparent. Plaintiff argues that the ALJ "rejected" the findings of Drs. Grafton and Espinoza as set forth in their "To Whom It May Concern" letters of May 5, 2011 and "accepted as valid" the opinions of a non-treating, non-examining state medical consultant, Dr. Emily Eisenhauer, who found that Plaintiff could perform medium-level work.  A fair reading of the record provides minimal support for Plaintiff's first challenge.

In her written opinion of December 6, 2011, the ALJ found that Plaintiff had an RFC to perform sedentary work that was further limited to only occasional overhead reaching, pushing, and pulling, that was free of fast-paced production requirements, and that allowed access to a restroom throughout the day.  (Tr. p. 13).  In arriving at that RFC assessment, the ALJ first discussed Plaintiff's hearing testimony following which she methodically summarized the records of Plaintiff's treating physicians, Drs. Gandhi, Bourg, Espinoza, Monier, Grafton, and Cowen, as well as the records that were generated at Ochsner, TRMC and CIS.  (Tr. pp. 14-17).  The ALJ then turned to the findings of the consultative examiners,

Drs. Simon and Mancuso.  (Tr. pp. 17-18).  As respects the opinion evidence, the ALJ gave

controlling weight to that which was voiced by Drs. Monier, Bourg, Ghandi, Cowen, Denys,

and McCain and the physicians at Ochsner in light of their consistency and the level of

record support.  (Tr. p. 19).  With specific reference to the two "To Whom It May Concern"

checklist forms that were signed by Drs. Grafton and Espinoza and were filed in the

administrative record as Exhibits 16F and 17F, the ALJ concluded as follows:

> I give some weight to the opinion of Dr. Grafton, but not controlling weight as
> his treatment notes do not support the restrictions placed upon claimant.  I
> especially note that Dr. Grafton is a dermatologist and his medical source
> statement contained in Exhibit 16F regarding claimant's episodes of
> diarrhea, abdominal cramping, joint swelling, difficulty sitting, standing and
> walking because of a possible autoimmune disorder not yet classified, refers
> to limitations outside of his area of expertise.
>
> I give some weight to the opinion of Dr. Espinoza, but not controlling weight
> as his treatment notes also do not support the restrictions placed upon
> claimant.  In his treatment notes, Dr. Espinoza noted that claimant was in no
> acute distress and responding well to medical treatment.  He also encouraged
> claimant to exercise.   Thus, I find that Dr. Espinoza's medical source
> statement contained in Exhibit 17F is internally inconsistent with his
> treatment notes.

(Tr. p. 19)(<em>emphasis added</em>).

The ALJ then went on to find that:

> [t]he state medical consultant and the undersigned have determined, albeit
> under different rationales, that claimant is not disabled.  Insofar as those
> opinions and conclusions are consistent with the findings and conclusions
> rendered herein, they are accepted as valid.

(Tr. p. 20)(<em>emphasis added</em>).

The state agency medical consultant, Dr. Eisenhauer, had found that Plaintiff was

capable of medium-level work.  (Tr. pp. 68-69).  The ALJ, on the other hand, ultimately

concluded that Plaintiff was capable of only sedentary-level work that was further reduced by additional manipulative and non-exertional limitations.

As the foregoing readily illustrates, contrary to Plaintiff's present assertions, the ALJ did not "reject" the findings of Drs. Grafton and Espinoza, even those that were set forth in the "To Whom It May Concern" checklist forms that the doctors completed on May 5, 2011, but instead gave the checklist form findings diminished weight.  Although the ALJ provided additional rationale for doing so, that she gave diminished weight to the opinions set forth on the forms is entirely understandable as the forms themselves are unaccompanied by any contemporaneously-recorded, medically acceptable findings and are thus entitled to little weight on that basis alone.  *Warncke v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980).  The use of such checklist forms is generally viewed with disfavor when the forms, as in the present case, are not adequately supported by any narrative citations to clinical findings.  *Haynes v. Astrue*, No. 11-CV-2289, 2012 WL 3860467 at *15-16 (E.D. La. July 23, 2012), *adopted*, 2012 WL 3863171 (E.D. La. Sept. 5, 2012), *aff'd*, 519 Fed.Appx. 258 (5th Cir. 2013)(and cases cited therein); *Morris v. Astrue*, No. 08-CV-4105, 2010 WL 497748 at *10 (E.D. La. Feb. 1, 2010).  Moreover, the ALJ credited the opinions of Dr. Eisenhauer only to the extent that they were consistent with the RFC assessment that the ALJ arrived at.  The present case is not one, as Plaintiff suggest, where the ALJ summarily rejected the opinions of a claimant's treating physician(s) in favor of those of a non-treating, non-examining consultant like Dr. Eisenhauer.  A cursory review of the ALJ's decision readily reveals that she credited the findings of <u>all</u> of the Plaintiff's treating physicians in arriving at the conclusions that she

did.  The ALJ, the Court believes, properly credited the opinion evidence, particularly the checklist forms upon which Plaintiff relies, that was before her.

Plaintiff's second challenge to the Commissioner's decision draws on the same common theme as her first in that it implicates the weight that the ALJ gave to the checklist form letters that were completed by Drs. Grafton and Espinoza and whether good cause for doing so was established.  As respects Dr. Grafton, Plaintiff takes umbrage with the specific reasons that the ALJ cited in discounting the doctor's checklist from findings, namely, that his contemporaneous treatment records did not support the noted restrictions and that a number of the restrictions were outside his area of expertise.  With respect to the checklist form findings of Dr. Espinoza, Plaintiff takes issue with the ALJ's stated reasons for discounting those findings, that Plaintiff was responding well to treatment, that she was observed to be in no acute distress at the time of examination, and that she was encouraged to exercise.

Plaintiff was seen by Dr. Grafton only twice during the relevant time period, on July 12, 2010 and again August 23, 2010, which was some time before he completed the checklist form on May 5, 2011.  As best as the Court can determine, in neither of Dr. Grafton's contemporaneous treatment notes did he place any limitation upon Plaintiff's activities, which is a proper consideration in a Social Security proceeding.  *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995); *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1989).  Dr. Grafton being a dermatologist, the ALJ could properly give diminished weight to his opinions regarding, *inter alia*, the existence and effects of diarrhea and her ability to ambulate effectively.  *See* 20 C.F.R. §404.1527(c)(5).

With respect to Dr. Espinoza, the Court recalls that Plaintiff saw him for the first time on December 16, 2010 for the purpose of obtaining a second opinion on an unidentified autoimmune disease.  On physical examination, Plaintiff had fibromyalgia tender points at unspecified locations but the results were otherwise normal.  Notably, Dr. Espinoza imposed no restrictions on Plaintiff's activities and actually encouraged her to exercise.  Just two days later, Plaintiff was evaluated by Dr. Simon who noted that she could perform household activities, dress and feed herself independently, drive, and visit with family.  Plaintiff had a normal gait and station, normal hand and arm function, and range of motion was intact in all joints with muscle strength at 5/5 bilaterally.

Plaintiff saw Dr. Espinoza again on March 3, 2011 and despite being described as "very symptomatic," she had only mildly tender fibromyalgia points and no synovitis, skin rash, or edema on physical examination.  Once again, no functional restrictions were imposed.  Notwithstanding Plaintiff's complaints of pain on March 17, 2011, a physical examination revealed only a mild facial butterfly rash, full grip strength in both hands, knees that were normal in appearance, and no other skin rashes or edema.  Plaintiff's fibromyalgia was characterized as "doing well" and she was continued on Naproxen.  It was not inappropriate for the ALJ to take notice of the fact that Plaintiff's condition was apparently responding favorably to medication.  *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).

Plaintiff's final visit to Dr. Espinoza occurred on April 21, 2011 for complaints of bruising unaccompanied by trauma.  The impression was ecchymosis and Plaintiff's medications were adjusted in an attempt to address that occurrence.  Once again, no

limitations on Plaintiff's activities were imposed.  On May 5, 2011, the very day that Drs. Grafton and Espinoza executed the checklist forms, Plaintiff was evaluated by Dr. Webb-Detiege who found that she had a normal gait and station, a full range of motion of the shoulders, elbows, and wrists, no pain to palpation of the metatarsophalangeal joints, no pain to palpation of the joints of the upper or lower extremities, and no synovitis.  Like Dr. Espinoza, Dr. Webb-Detiege did limit Plaintiff activities in any way.   Whether or not Plaintiff was observed to be in acute distress at the time of Dr. Espinoza's evaluations was an observable circumstance that examining physicians typically report.  The fact that the doctor had encouraged Plaintiff to exercise was not qualitatively different from recognizing the routine daily and other activities that a Social Security claimant is capable of performing which may properly be considered by an ALJ.  *Anderson v. Sullivan*, 887 F.2d 630, 632 (5th Cir. 1989).  Given the body of the evidence that was before her, the Court believes that the ALJ gave the "To Whom It May Concern" checklist forms that were completed by Drs. Grafton and Espinoza the weight that they deserved.

Plaintiff's third and final challenge to the Commission's decision is that "[t]he decision does not address the findings of the consulting psychiatrist," Dr. Mancuso.  (Rec. doc. 14-2, pp. 1, 9).  Plaintiff argues that although the ALJ purported to give Dr. Mancuso's opinions great weight, she failed to address or adequately incorporate into her hypothetical questions to the VE the doctor's findings that Plaintiff's ability to sustain effort and to persist at a normal pace over the course of a routine forty-hour work week would be fair and that her ability to tolerate the stress and pressure associated with day-to-day work

activity demands would likely be impaired.  (Rec. doc. 14-2, p. 9).  Once again, a fair reading of the ALJ's decision does not bear this out.

As noted earlier, following a consultative evaluation, Dr. Mancuso found that Plaintiff had no significant disturbance of memory or concentration, had a good ability to relate to others, and had a fair to good ability to maintain attention and to perform simple repetitive tasks for two-hour blocks of time.  Plaintiff's ability to sustain effort and to persist at a normal pace over the course of a forty-hour work week was thought to be fair and may be affected by physical complaints.  Her ability to understand, remember, and follow simple commands was felt to be good but her ability to tolerate the stress and pressure of day-to-day work activities and demands was likely to be impaired.  However, the extent of any such impairment was not specified or quantified in any way.  Psychiatric treatment was believed to be beneficial.

In her written decision, the ALJ thoroughly discussed Dr. Mancuso's findings just like she did with all of the practitioners who had treated and examined Plaintiff.  (Tr. pp. 17-18).  In light of the concerns that were voiced by Dr. Mancuso, the ALJ duly incorporated in her hypothetical question to the VE the need for work that was performed in an environment free of fast-paced production requirements and with only routine workplace changes.  With those limitations in mind, the VE testified that the hypothetical individual would be unable to perform Plaintiff's past work but could still function in a number of sedentary-level positions which existed in significant numbers in the economy.  Despite being tendered to Plaintiff's counsel to correct any perceived deficiencies in the hypothetical questions, including the addition of any non-exertional limitations that were

not recognized by the ALJ, counsel posed no questions along those lines.  Plaintiff should not now be heard to complain of the adequacy of the ALJ's hypothetical questions to the VE when it was not deemed sufficient to merit adversarial development in the administrative hearing that was held below.  *Masterson v. Barnhart*, 309 F.3d 267, 273-74 (5th Cir. 2002); *Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  In carrying out her regulatory responsibility to assess Plaintiff's RFC, 20 C.F.R. §§404.1527(e)(1) and 404.1546(c), the ALJ properly incorporated therein the non-exertional limitations that had been recognized by Dr. Mancuso in connection with her diagnosis of depression and anxiety disorder.  In light of the foregoing, the Court believes that the ALJ adequately addressed Dr. Mancuso's findings both in her written decision and in her hypothetical question to the VE, the answer to which provided sufficient support for the conclusion that Plaintiff was not disabled.  *Morris v. Brown*, 864 F.2d 333, 336 (5th Cir. 1988).

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that Plaintiff's motion for summary judgment be denied, that Defendant's motion for summary judgment be granted, and that Plaintiff's suit be dismissed.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with

35

notice that such consequences will result from a failure to object.  *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 13th day of _____ June _____, 2014.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

36